2019 IL App (1st) 190912-U

THIRD DIVISION
December 18, 2019

No. 1-19-0912

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| LYUBOMIR LESIV, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 7400 |
| | ) | |
| ILLINOIS CENTRAL RAILROAD CO. | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed; plaintiff failed to raise a genuine issue of material fact as to whether defendant retaliated against plaintiff for protected workplace activity; and regardless of whether sexual orientation harassment is prohibited under the Illinois Human Rights Act, plaintiff failed to create genuine issue of material fact as to whether the workplace was hostile due to harassment based on plaintiff's national origin and perceived sexual orientation.

¶ 2    Plaintiff, Lyubomir Lesiv, filed an amended complaint (complaint) against defendant, Illinois Central Railroad Company, under the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2016)) seeking damages for, *inter alia*, (1) harassment based on his national origin (count I), (2) harassment based on sexual orientation (count III), and (3) retaliation (count VI).  Defendant filed a

motion for summary judgment. Following briefing the circuit court of Cook County granted defendant's motion for summary judgment on all counts in plaintiff's complaint.

¶ 3 For the following reasons, we affirm.

¶ 4                                BACKGROUND

¶ 5 According to the complaint plaintiff is a male of Ukrainian and Russian descent. Defendant employed plaintiff beginning on April 5, 2013 as an Apprentice Carman and in January or February 2014 plaintiff's position changed to Carman. Plaintiff's complaint alleges that beginning in August 2014 and continuing through January 27, 2016 (when defendant terminated plaintiff's employment) plaintiff was "subjected to comments on the basis of his national origin and perceived sexual orientation." Specifically, plaintiff alleged that during that time period his supervisors Andy Houston, Dan Duggan, and Daniel Studer referred to plaintiff using a derogatory epithet for homosexual men. Plaintiff also alleged that on multiple occasions "throughout his employment with [d]efendant" he was denied overtime and holiday pay. Plaintiff's complaint details specific acts of harassment and/or retaliation by various supervisors. We will attempt to arrange those allegations in a manner that best aids understanding of the issues and arguments on appeal.

¶ 6 Plaintiff alleged to have suffered harassment at the hands of his supervisors Michael Tyler Moore, Andy Houston, Daniel Duggan, and Daniel Studer.

¶ 7 Plaintiff alleged that Moore made the following comments to him: in August 2014 Moore referred to plaintiff as gay and asked plaintiff if he was "going to the gay bars in the city tonight." On January 14, 2016, after plaintiff broke up with his girlfriend, Moore said to plaintiff "it's because she's Russian and you're Ukrainian; Russians hate Ukrainians."

¶ 8 Plaintiff alleged Houston made the following comments to him: in August 2014 Houston stated to plaintiff "what is it with you Russians trying to take over the railroad," "all Russians have a drinking

problem," and "Russians drink all the time." On or about July 24, 2015 Houston stated to plaintiff "You f***ing Russian, you don't know how to do your job;" "are you USSR;" and "are you KGB?" In August 2015, Houston stated to plaintiff "you two USSRs will work together" referring to plaintiff and his brother, who defendant also employed as a Carman. Plaintiff's complaint alleged that on or about July 24, 2015, plaintiff complained to Duggan about Houston's "offensive and unprofessional conduct."[1]

¶ 9    Plaintiff alleged Duggan made the following comments to him: in July 2015 Duggan said in front of other employees, after plaintiff entered the locker room, "hey guys, don't drop the soap, Lyubo is here;" Duggan asked plaintiff "are you hitting up Boystown tonight;" Duggan asked plaintiff "are you too scared to mess up your looks." On July 24, 2015, after plaintiff complained about Houston to Duggan, Duggan responded "quit being a little bitch." On July 27, 2015 Duggan stated to plaintiff "you look like a gay Russian;" and "is that what Russian f**s wear in Russia?"

¶ 10    Plaintiff alleged Studer made the following comments to him: On December 14, 2015, after plaintiff returned from work following a 60-day suspension (see infra, ¶ 18) Studer stated to plaintiff "I don't give a flying f*** if you tell Rick Galvin this or not, I'm not here to play games, I have r******* Carmen missing seal steps and broken handholds, I'm not f****** playing games, I will fire your foreign ass if you get in my way."

¶ 11    Count I of plaintiff's complaint is for "national origin harassment" and lists (1) the August 2014, July 24, 2015, and August 2015 comments by Houston; (2) the July 24, 2015 and July 27, 2015 comments by Duggan; (3) the December 14, 2015 comment by Studer; and (4) the January 14, 2016

---

[1]    Plaintiff's complaint also alleged that on approximately July 25, 2015, plaintiff complained to Paul Bomba, president of the union, and on approximately July 27, 2015, plaintiff complaint to Karen McCarthy and Angela Lee, both human resources representatives for defendant.

comment by Moore as the harassment plaintiff suffered. Plaintiff alleged the harassment was "continuous" and "persistent," "had the effect of creating a hostile and intimidating work environment," and "adversely affected the terms and conditions of [p]laintiff's employment and interfered with his ability to do his job."

¶ 12     Count III of plaintiff's complaint is titled "Complaint of Perceived Sexual Orientation Harassment Pursuant to the Illinois Human Rights Act." Count III lists (1) the August 2014 comments by Moore; (2) the use of the epithet by Houston, Duggan, and Studer between August 2014 and January 27, 2016; and (3) the July 2015 and July 27, 2015 comments by Duggan as the harassment plaintiff suffered. Plaintiff's complaint alleges the harassment was continuous and persistent, had the effect of creating a hostile and intimidating work environment, and adversely affected the terms and conditions of plaintiff's employment and interfered with his ability to do his job.

¶ 13     Count VI of the complaint is for retaliation. Count VI states Houston, Duggan, and Studer subjected plaintiff to offensive comments and name calling on the basis of his national origin and perceived sexual orientation and that on or about July 24, 2015 plaintiff complained to Duggan about Houston's "offensive and unprofessional behavior" to which Duggan responded by telling plaintiff to "quit being a little bitch." Plaintiff further alleged that on or about July 25, 2015 he complained to Paul Bomba about Houston, and on or about July 27, 2015 he complained to Karen McCarthy and Angela Lee, both Human Resources representatives, about Houston. The complaint for retaliation alleges that on July 27, 2015 Duggan and Studer both refused to sign plaintiff's college tuition reimbursement form. Then, in August 2015, defendant abolished plaintiff's position at its Markham, Illinois location and Duggan transferred plaintiff to a location in Gary, Indiana. Plaintiff's complaint also alleged that in August 2015 defendant abolished plaintiff's position at its location in Markham, Illinois and Duggan transferred plaintiff to a location in Gary, Indiana. Plaintiff alleged that on October 12, 2015 Anthony

Grayer instructed plaintiff and two other Carmen to leave their shift early; then, on October 15, 2015, Ricardo Galvin suspended plaintiff and the other two Carmen for 60 days for leaving early on October 12.

¶ 14　Plaintiff further alleged that after he returned to work on December 14, 2015 following his suspension Studer said to plaintiff "I don't give a flying f*** if you tell Rick Galvin this or not, I'm not here to play games, I have r******* [C]armen missing seal steps and broken handholds, I'm not f****** playing games, I will fire your foreign ass if you get in my way." The next day, on December 15, 2015, Studer audited his work for two hours. On December 22, 2015, Galvin assigned Billy Baisden to audit plaintiff's work. As a result of Baisden's December 22nd audit defendant suspended plaintiff for 60 days ultimately resulting in defendant terminating plaintiff's employment on January 27, 2016. Plaintiff alleged that on December 22nd he was working with another Carman "who was equally responsible for any errors in their work" and that Carman was never disciplined as a result of the same audit. Count VI further alleged that "on multiple occasions throughout his employment" plaintiff was denied overtime pay and holiday pay. Plaintiff alleged he was terminated on January 27, 2016 as a result of the December 22, 2015 audit.

¶ 15　Plaintiff alleged in count VI of his complaint that he engaged in protected activity when he complained about Houston and similarly situated employees who did not complain about Houston were not (1) denied signatures on their tuition reimbursement documents, (2) transferred to an unfavorable work location, (2) suspended for following their supervisors' orders [to leave their shift early], (3) audited twice in one week, or (4) terminated. Plaintiff alleged these acts occurred within such a short period of time relative to his "opposition to the harassment" so as to raise a strong inference of retaliatory motive" and that defendant's conduct amounts to retaliation in violation of the Act.

¶ 16    On January 15, 2016, plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights. The Charge stated that the discrimination occurred between August 2014 and the filing of the charge. The Charge alleged (1) national origin harassment, (2) national origin discrimination, (3) harassment based on perceived sexual orientation, (4) retaliation in the form of (a) failure to pay wages, (b) denial of overtime pay, (c) denial of holiday pay, (d) refusal to sign reimbursement documents, and (e) suspension for opposing unlawful discrimination. Plaintiff had not yet been terminated therefore he did not include retaliatory termination in his charge.

¶ 17    The parties engaged in discovery. After discovery defendant filed a motion for summary judgment as to all counts in plaintiff's complaint. As it pertains to this appeal, with regard to plaintiff's claims he was harassed based on his national origin, defendant argued it was entitled to summary judgment because "the evidence adduced has not shown that Plaintiff was subject to any conduct considered severe or pervasive." According to defendant, plaintiff only complained about "2 discrete conversations with one supervisor that occurred one year apart, 1 conversation with another supervisor, and 1 conversation with another supervisor, from the timeframe of August 2014 to January 2016" Defendant also argued allegations that occurred outside the limitations period in the Act should not be considered.

¶ 18    Regarding plaintiff's claim he was harassed based on his perceived sexual orientation defendant argued the Act does not recognize a cause of action for perceived sexual orientation harassment and, regardless, there was no evidence the alleged comments were made due to any perception about plaintiff's sexuality but were instead "simple teasing" about his clothing that was "neither sever[e] or pervasive in nature." Additionally, defendant argued it was entitled to summary judgment on plaintiff's claim of retaliation because plaintiff failed to exhaust his administrative remedies as to that claim, there was no evidence to satisfy the elements of a retaliation claim under the "direct method" of proof, and

there was no evidence to satisfy the elements of a retaliation claim under the "indirect method" of proof. Defendant argued plaintiff failed to establish a *prima facie* case of retaliation under the direct method because (1) the relevant decision makers had no knowledge of any protected activity by plaintiff, (2) plaintiff can show no causal connection between his alleged protected activity and his suspension and termination, and (3) plaintiff had no evidence that defendant's legitimate, non-discriminatory reasons for the suspension and termination were pretextual. Defendant argued plaintiff failed to establish a *prima facie* case of retaliation under the indirect method because plaintiff had no evidence similarly situated individuals no in plaintiff's protected class were treated more favorably, plaintiff had no evidence he was meeting defendant's legitimate business expectations, and plaintiff had no evidence defendant's legitimate, non-discriminatory reasons for plaintiff's suspension and termination were pretextual.

¶ 19    Plaintiff filed a response to defendant's motion for summary judgment in which plaintiff stated additional facts about his suspension and termination taken from his deposition and related other instances of discrimination directed at him and other "non-American [C]armen." Plaintiff's response argued he did not fail to exhaust his administrative remedies for his termination claim because he is permitted to "bring additional allegations of retaliatory actions that are not specifically referenced to in the Charge of Discrimination as long as retaliation has been raised as a claim in the Charge." In this instance, plaintiff argued he raised multiple allegations of retaliatory acts in the charge filed with the Department of Human Rights then properly brought the additional allegation of retaliatory termination in his lawsuit because the retaliatory termination "is directly linked to the retaliatory audit *** on December 22, 2015." Next, plaintiff's response argued the prohibition against sex discrimination includes same-sex harassment based on a person's failure to conform to gender stereotypes and the Act does not allow sexual orientation harassment.

¶ 20　Plaintiff asserted he had "clearly shown that the harassment he was subjected to was not just pervasive, but also severely altered the conditions of his employment." Plaintiff then simply repeated his allegations and concluded that "when added up over the period of time that [plaintiff] was employed at [defendant,] it certainly created a hostile work environment" and is actionable. Plaintiff further responded that the acts of harassment he alleged fall under the continuing violation theory because they were nearly identical forms of harassment that occurred throughout his employment therefore plaintiff can seek relief for alleged acts that occurred outside the limitations period. Plaintiff argued he established a *prima facie* case of retaliation based on "cat's paw" liability. "Cat's paw liability" describes a scenario when an employee or supervisor, motivated by discriminatory intent, influences an otherwise unbiased decision-maker to take an adverse employment action against another employee. Plaintiff argues the supervisor who suspended him resulting in his termination relied on input from Duggan, Houston, and others with retaliatory animus toward plaintiff. Plaintiff argued he was retaliated against for asking for his correct pay and complaining about being harassed. Plaintiff also asserted the December 22nd audit was a retaliatory act. Plaintiff also argued he established a *prima facie* case of retaliation for his termination because the supervisor who terminated him took "input from multiple supervisors (Studer and Grayer) who did have knowledge and actively participated in the discrimination of [plaintiff.]"

¶ 21　Defendant filed a reply to plaintiff's response. Following briefing, the trial court issued a written order granting defendant's motion for summary judgment.

¶ 22　This appeal followed.

¶ 23　　　　　　　　　　　　　　　ANALYSIS

¶ 24 Plaintiff first argues defendant is not entitled to summary judgment on plaintiff's claim of retaliation[2] because a genuine issue of material fact remains as to whether a causal nexus exists between plaintiff's protected activities and defendant's adverse employment actions.[3] Summary judgment is a drastic measure and should only be granted when the moving party's right to judgment is 'clear and free from doubt.' [Citation.]" *Vulpitta v. Walsh Construction Co.*, 2016 IL App (1st) 152203, ¶ 22. "Summary judgment is appropriate 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' [Citation.]" *Id.* "To determine whether there is a genuine issue of material fact, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. [Citation.]" *Id.* Unsupported conclusions, opinions, and speculation are not sufficient to raise a genuine issue of material fact. *Id.* "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the

---

[2]    "It is a civil rights violation for a person, or for two or more persons to conspire, to:
  (A) Retaliation. Retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in elementary, secondary, and higher education, discrimination based on citizenship status in employment, because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act, or because he or she has requested, attempted to request, used, or attempted to use a reasonable accommodation as allowed by this Act." 775 ILCS 5/6-101(A) (West 2016).

[3]    On appeal plaintiff argues the trial court applied the "incorrect standard of review" when it granted summary judgment for defendant. Specifically, defendant argues the trial court erroneously evaluated plaintiff's retaliation claims under the standards applicable to discrimination claims and never applied the standards applicable to determine whether a plaintiff has stated a *prima facie* case of retaliation. This court applies a de novo standard of review to motions for summary judgment, which means this court performs the same analysis that the circuit court would perform. *Atlas v. Mayer Hoffman McCann, PC*, 2019 IL App (1st) 180939, ¶ 26. "De novo review is completely independent of the trial court's decision." (Internal quotation marks omitted.) *Wade v. Stewart Title Guaranty Company*, 2017 IL App (1st) 161765, ¶ 60. We review the trial court's judgment, "not its reasoning for its judgment, and we may affirm on any basis supported by the record." *Estate of Black v. Black*, 2019 IL App (1st) 181452, ¶ 14.

material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). We review a trial court's order granting summary judgment *de novo*. *Vulpitta*, 2016 IL App (1st) 152203, ¶ 22

¶ 25    To succeed on a claim of retaliation the plaintiff must show that (1) they engaged in a statutorily protected activity, (2) their employer took a materially adverse action against them, and (3) there is a causal link between the two. *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 65. "Protected activity includes internal complaints to managers or other appropriate persons." *Id*. ¶ 67. Filing a complaint with an employer may constitute statutorily protected activity but the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).[4] "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id*.

> "[A] materially adverse action 'need not be one that affects the terms and conditions of employment, but it "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." [Citations.]'
>
> The Supreme Court has cautioned that 'it is important to separate significant from trivial harms,' and that Title VII 'does not set forth "a general civility code for the American workplace." [Citations.]' Title VII's anti-retaliation provision does not protect

---

[4]    In assessing claims brought under the Act we are guided by both Illinois case law and federal case law relating to federal anti-discrimination statutes such as Title VII of the Civil Rights Act of 1964 and the anti-retaliation provisions of those statutes. *Lau*, 2019 IL App (2d) 180456, ¶ 38, citing *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989).

an employee against 'petty slights or minor annoyances that often take place at work and that all employees experience.' [Citations.] The provision 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.' [Citation.]" *Lewis v. Wilkie*, 909 F.3d 858, 867–68 (7th Cir. 2018).

Finally, a plaintiff can demonstrate a casual connection between statutorily protected activity and a materially adverse action "by showing that the defendant 'would not have taken the adverse *** action but for [the] protected activity.' [Citations.]" *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).

¶ 26    Plaintiff argues the record sufficiently shows there is a genuine issue of material fact as to the causal nexus between plaintiff's engagement in protected activities and defendant's adverse employment actions. On appeal plaintiff relies solely upon his complaint to Duggan about Houston as the protected activity and suspicious timing as establishing the causal nexus. Specifically, plaintiff argues the adverse employment actions he suffered were (1) continuing to refuse to pay plaintiff his owed overtime and holiday pay, (2) Duggan's initial refusal to sign plaintiff's tuition reimbursement form, (3) having his job at defendant's Markham site abolished, and (4) the suspension, multiple audits, and eventual termination.

¶ 27    Circumstantial evidence from which intentional discrimination may reasonably be inferred can supply the causal link between protected activity and adverse employment actions. *Id.* See also *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). All of the evidence must be considered as a whole to determine whether "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the *** adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Suspicious timing can

sometimes raise an inference of a causal connection, but temporal proximity alone is 'rarely sufficient' to establish causation. [Citation.]" *Castro*, 786 F.3d at 565.

¶ 28    Defendant argues that to establish a causal nexus between plaintiff's protected activity and an adverse action, "as a threshold matter, [plaintiff] must establish that the relevant decision makers had knowledge of the protected conduct," and in this case none of the relevant decision makers had any knowledge of plaintiff's complaints in July 2015 or December 2015. "A critical issue in determining whether there is a causal connection is 'whether the person who made the decision *** was aware of the *** allegations at the time ***.' [Citation.] In fact, the Seventh Circuit has stated that absent such knowledge on the part of the decision-maker, a plaintiff lacks a causal link between her termination and the complaint of discrimination or harassment. [Citations.]" *Mingo v. Roadway Express, Inc.*, 135 F. Supp. 2d 884, 903 (N.D. Ill. 2001). This is true even if there is a short period of time between the protected activity and the adverse employment action. *Id.* at 904 n4, see also *Harris v. City of Harvey*, 993 F. Supp. 1181, 1188 (N.D. Ill. 1998) ("It is possible to infer a causal link between the protected activity and the adverse action where the action follows 'on the heels' of the protected activity and where it is reasonable to infer that the person responsible for the adverse action had knowledge of the protected activity."). At the summary judgment stage the plaintiff is not required to prove by a preponderance of the evidence that the responsible party was aware of the protected activity but "he must at least produce evidence that would support an inference that [person] was so aware." *Maarouf v. Walker Manufacturing Co., Division of Tenneco Automotive, Inc.*, 210 F.3d 750, 755 (7th Cir. 2000).

¶ 29    Plaintiff does not identify an individual who allegedly refused to pay him the overtime and holiday pay he was due. Defendant's motion for summary judgment argued plaintiff testified in his deposition that he "had no basis to believe the pay mistake was intentional, let alone due to discrimination – nor did he identify any similarly-situated employees outside his protected class who

were treated more favorably." In the deposition testimony defendant relied upon, when asked why he thought the failure to pay him his overtime hours "was discriminatory in some way" plaintiff responded "Well, I had evidence to show that the hours and the amount of time that I worked and the company did not pay me back." When asked if the failure to pay him the overtime he was due was because of his national origin or perceived sexual orientation plaintiff responded "I don't recall."

¶ 30    To defeat a properly supported motion for summary judgment

> "the non-movant must present facts to show a genuine dispute exists to avoid summary judgment, which requires that she 'do more than simply show that there is some metaphysical doubt as to the material facts.' [Citation.] When evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. [Citation.] But the nonmovant 'is only entitled to the benefit of inferences supported by admissible evidence, not those "supported by only speculation or conjecture." ' [Citation.]" *Bigger v. Facebook, Inc.*, 375 F. Supp. 3d 1007, 1014 (N.D. Ill. 2019).

¶ 31    On appeal, plaintiff argued he complained about not receiving the correct rate of pay, after he complained defendant rectified that issue, but defendant "continued to refuse to pay Plaintiff his owed overtime and holiday pay." Plaintiff does not argue the existence of a causal nexus but instead simply asserts the issue was never fully resolved and defendant simply ignored plaintiff's "plea for correct pay." Plaintiff has pointed to no facts from which to reasonably infer "plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused" the failure to pay him overtime and holiday pay. *Ortiz*, 834 F.3d at 765. Plaintiff has failed to demonstrate a genuine issue of material fact that defendant's failure to pay him overtime or holiday pay was retaliatory.

¶ 32    Duggan had knowledge of plaintiff's complaint about Houston's alleged conduct (plaintiff made the complaint to Duggan) but defendant argues plaintiff has no evidence Duggan's failure to immediately sign the form "was somehow connected to [plaintiff's] earlier complaint to [Duggan.]"  In support of his argument for a causal nexus between Duggan's failure to sign the tuition form and plaintiff's complaints about Houston plaintiff argues there was "a short period of time" (days) between plaintiff's reporting of Houston and Duggan's refusal to sign the form.  The Seventh Circuit "repeatedly held that [s]uspicious timing alone rarely is sufficient to create a triable issue, and on a motion for summary judgment, mere temporal proximity is not enough to establish a genuine issue of material fact." (Internal quotation marks omitted.)  *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018), citing *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009), quoting *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008).  "Rather, a short gap 'may permit a plaintiff to survive summary judgment' only if 'there is also other evidence that supports the inference of a causal link.'  [Citation.]" *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018).

¶ 33    For example, in *Harris*, 993 F. Supp. at 1188, the plaintiff complained about a hostile work environment in November 1994 and alleged that her employer retaliated against her in December 1994. The plaintiff in *Harris* also alleged that she complained again in March 1995 and suffered an adverse action in May or June of the same year.  *Id*.  The Harris court found that after reviewing the facts as a whole in a light most favorable to the plaintiff it could not say as a matter of law that the plaintiff had failed to satisfy the causal link requirement and, therefore, had not made a *prima facie* case for retaliation.  *Id*.  The court held that there was sufficient evidence for a jury to infer a causal link between the plaintiff's complaint on November 21, 1994 and the adverse action in December 1994 "because the action followed 'on the heels of' [the plaintiff's] complaint." *Id*.  However, in Harris, in addition to the timing of the protected activity and the adverse action, there was other evidence to demonstrate a

connection between the events. *Cf. Harris*, 993 F. Supp. at 1188 n 8 (finding no causal link between complaint and alleged adverse action taken within about three months where the plaintiff had not demonstrated any connection between the events). After the plaintiff's complaint in Harris, the supervisor to whom the plaintiff complained called the plaintiff "a 'hell raiser' " and held a meeting of all employees at which the supervisor told the employees the plaintiff complained about what the complaints were resulting in those employees physically threatening the plaintiff and the supervisor admonishing the employees. *Id*. at 1184.

¶ 34    Plaintiff has identified no facts other than the timing of events that would allow a reasonable trier of fact to conclude that Duggan would not have refused to sign plaintiff's tuition reimbursement form "but for" plaintiff's complaints about Houston or that plaintiff's complaints, ethnicity, or perceived sexual orientation caused Duggan to refuse to sign the form. Plaintiff has failed to demonstrate a genuine issue of material fact that the failure to sign his tuition reimbursement form was retaliatory.

¶ 35    Plaintiff's argument he suffered retaliation in the form of having his job at defendant's Markham site abolished similarly fails. Plaintiff testified in his deposition that job abolishments were determined by his collective bargaining agreement based on seniority and manpower needs, job abolishment was not uncommon, he did not recall who made the decision to abolish his job, and he had no basis to connect the abolishment of his job to his complaint to human resources. On appeal, plaintiff only argues only that there was also a short period of time (weeks) between plaintiff's complaint to Duggan about Houston and the abolishment of plaintiff's job at Markham. Plaintiff has identified no facts other than the timing of events that would allow a reasonable trier of fact to conclude that plaintiff's job at Markham would not have been abolished "but for" plaintiff's complaints about Houston or that plaintiff's complaints, ethnicity, or perceived sexual orientation caused plaintiff's job at Markham to be

abolished. Plaintiff has failed to demonstrate a genuine issue of material fact that the job abolishment was retaliatory.

¶ 36    Finally, plaintiff argues there is a causal nexus between his complaints and his suspension, audits, and termination because a short period of time after plaintiff complained to Duggan about Houston (two-and-a-half months) Grayer allegedly lied about telling plaintiff he could go home early which led to plaintiff's suspension, multiple audits, and eventual termination. Plaintiff argues on appeal that "[t]he record shows that but for Grayer's lie *** Plaintiff would not have received a suspension, nor would he have been audited *** and eventually, terminated." Defendant argues it is indisputable that Grayer had no knowledge of plaintiff's complaints. Plaintiff does not argue or point to any facts from which to infer that Grayer had any knowledge of plaintiff's complaints. Although plaintiff accuses Grayer multiple times of lying about telling plaintiff and the other two Carmen they could leave their shift early, plaintiff does not argue Grayer lied because of plaintiff's complaint, ethnicity, or perceived sexual orientation. Plaintiff argues that it is "clear that these materially adverse employment actions *** directly stemmed from Plaintiff's complaint about Houston's national origin harassment" but plaintiff claims the suspension, audits, and termination all stem from Grayer's alleged lie without linking that alleged lie to any protected activity or status.

¶ 37    Anti-discrimination laws like the Act only require that employers not use a characteristic the law says employers may not consider as a ground of decision. See *Monroe v. Children's Home Ass'n of Illinois*, 128 F.3d 591, 593 (7th Cir. 1997). Not only has plaintiff failed to establish that Grayer was aware of plaintiff's complaint when he allegedly lied (*Mingo*, 135 F. Supp. 2d at 903), plaintiff has adduced no evidence from which it may reasonably be inferred that plaintiff's ethnicity or perceived sexual orientation caused Grayer to lie (see *Ortiz*, 834 F.3d at 765). Any suggestion that Grayer lied due

to any animus toward plaintiff is at best the product of "speculation or conjecture" which is insufficient to show a genuine dispute of material fact exists. *Bigger*, 375 F. Supp. 3d at 1014.

¶ 38    "A plaintiff can also succeed on a retaliation claim by the "indirect method" which "refers to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That method allows the plaintiff to establish a *prima facie* case without proving a direct causal link." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Under the indirect method the plaintiff must show that:

> "(1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, the employer took an adverse action against her; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. [Citation.] If the plaintiff establishes those elements, the burden shifts to the defendant to articulate a legitimate reason for the adverse action. [Citation.] If it does so, the burden of production returns to the plaintiff to show that the defendant's reason is pretextual. [Citation.] The ultimate burden of persuasion is at all times on the plaintiff. [Citation.]" *Rozumalski v. W.F. Baird & Associates., Ltd.*, No. 18-3586, 2019 WL 3955383, at *4 (7th Cir. Aug. 22, 2019).

Plaintiff argues that defendant's reasons for plaintiff's suspension and termination are pretextual. Plaintiff also cites *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012), overruled on other grounds by *Ortiz*, 834 F.3d 760, for the proposition that " 'cat's paw' liability may be imposed on an employer 'where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.' [Citations.]" Plaintiff argues his suspension "was based on a lie by the supervisor involved." Plaintiff also argues his suspension was

influenced by Studer, (who plaintiff describes as "one of the most persistent harassers of [plaintiff]") because Studer was "included in the October meeting that led to the suspension" and "the supervisor to oversee the Investigation hearing" after plaintiff's audit; and he also suggests that Grayer had "discriminatory animus" when he provided "his inaccurate description of the events."

¶ 39    As stated above plaintiff adduced no evidence of any discriminatory animus on the part of Grayer beyond speculation and conjecture; therefore, any claim of "cat's paw liability" plaintiff asserts as to Grayer's alleged acts fails. *Harris v. Warrick County Sheriff's Department*, 666 F.3d 444, 448 (7th Cir. 2012) ("an employer may be liable for employment discrimination if a nondecision-maker 'performs an act *motivated by [discriminatory] animus* that is intended *** to cause an adverse employment action, and *** that act is a proximate cause of the ultimate employment action.' [Citation.]" (Emphasis omitted and emphasis added.)). Plaintiff did allege that on December 14, 2015, Studer made the following comment: "I don't give a flying f*** if you tell Rick Galvin this or not, I'm not here to play games, I have r******* Carmen missing seal steps and broken handholds, I'm not f****** playing games, I will fire your foreign ass if you get in my way."

¶ 40    To create a genuine issue of fact as to whether a non-decision maker was the cause of an adverse employment action for purpose of "cat's paw" liability "[t]he key question is whether the non-decision-maker's actions were a 'causal factor,' based on common-law proximate cause principles, in the termination decision." *Smith*, 681 F.3d at 900. "[T]he requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause." *Staub v. Proctor Hospital*, 562 U.S. 411, 420 (2011). If the investigation results in an adverse action "for reasons unrelated to the *** original biased action *** then the employer will not be liable." *Id*. at 421. Thus, "the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased

employee." (Internal quotation marks omitted.) *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015).

¶ 41    Plaintiff's argument would require that Galvan's decision to suspend plaintiff for leaving his shift early was not only based on information Studer provided but also that Galvan's investigation failed to meaningfully investigate that information or yield reasons to suspend plaintiff independent of any biased information Studer provided. Plaintiff cites to no evidence to support his conclusion that Galvan's basis for plaintiff's suspension (which led to the audit upon his return which led to the termination after the audit) was "the input of supervisors with a history of harassing Plaintiff, including Studer." During his deposition Galvan testified that when he learned about plaintiff and two other Carmen leaving their shift early he scheduled a meeting between the Carmen and their supervisors. Galvan testified Studer was present for that meeting but Grayer was the individual supervising plaintiff on the date in question. Galvan testified that during this meeting Grayer told Galvan that once plaintiff and the two other Carmen finished inspecting their track Grayer told them he would call them back but after a while Grayer realized the men had gone home for the day. Galvan also testified that during that meeting plaintiff told Galvan the men left the property with permission. Galvan later recounted the meeting as follows:

> "[W]hen we—when we first met, I asked the managers to give me—give me the facts of what had happened, and I gave the employees the opportunity to give me the facts. At the time I remember reviewing the document where it shows what time they inspected the last track, and there was a discrepancy of how long they had actually took to inspect the amount of cars.
>
> I was very clear with them that it was very obvious to me based on the information that they had provided at the time that they had left the property without

proper authority, and they actually either didn't do their job or they falsified a federal document. A federal document is an inspection sheet that we are required to fill out when we inspect cars.

* * *

[B]ased on the records that I saw, and based on the questions that I asked them about defects that they had found, what they had repaired, it was obvious to me that they rushed through that track just to get done early.

And I told them that when they came back to work, I was going out there and inspect trades behind them, and they better be doing their job.

They all agreed. The union came in towards the tail end of the conversation. I left the room.

They had a side bar in the parking lot. Union came back to my office. They thanked me for saving my jobs [sic]. They knew we could prove our case and that was the end of it."

Studer testified in his deposition that during that meeting he and Galvan reviewed the employees' work history. Studer send the discipline records for the three Carmen to Galvan before the meeting. Studer also testified there was video evidence of the three employees in the office during their shift but he agreed there could be other reasons for them being in the office. Galvan testified that after that meeting he issued a suspension to all three of the employees.

¶ 42    Viewing the evidence in a light most favorable to plaintiff we cannot say that a reasonable trier of fact could infer that Studer was motivated by discriminatory animus in his actions during the

suspension process[5] or that Galvan failed to meaningfully investigate the information Studer provided or that Galvan's investigation did not uncover reasons for the suspension unrelated to any biased action by Studer. Plaintiff does not assert Studer was aware of plaintiff's complaint about Houston. Further, the evidence establishes that Galvan did conduct a meaningful investigation and that he based his decision on objective evidence independent of the discipline records Studer provided including time records, information from the Carmen, their inspection sheets, and their answers to Galvan's questions. The record evidence also directly contradicts plaintiff's argument that "the adverse employment action was *** based on a lie by the supervisor involved" but even if it was, there is no evidence that "lie" was motivated by bias or discriminatory animus. Even accepting that Galvan did consider Grayer's and Studer's input, the evidence establishes that Galvan broke the causal chain between the information they provided and the adverse action by conducting a meaningful and independent investigation of the information being supplied. *Woods*, 803 F.3d at 870.

¶ 43    Plaintiff has failed to demonstrate a genuine issue of material fact to withstand summary judgment. Accordingly, the trial court's judgment granting summary judgment in favor of defendant on plaintiff's retaliation claim is affirmed.

¶ 44    Next, plaintiff argues the trial court erred in granting summary judgment in favor of defendant on plaintiff's claim of harassment. "In analyzing employment discrimination claims, Illinois follows the format set out in decisions analyzing claims made under Title VII of the Civil Rights Act of 1964." *Board of Regents for Regency Universities v. Human Rights Comm'n*, 196 Ill. App. 3d 187, 195 (1990). Thus, the Act "protects employees from workplace harassment. [Citation.] *** But not all offensive conduct violates Title VII. [Citation.] Consequently, courts must focus on the specific characteristics of

---

[5]    Plaintiff does not assert that Studer provided Galvan false disciplinary records.

the alleged harassment to determine the severity or pervasiveness of the harassment." *Howard v. Sheahan*, 546 F. Supp. 2d 566, 570 (N.D. Ill. 2008). "A hostile work environment claim contains four elements: (1) the employee was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII ***; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability." *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 560 (7th Cir. 2019).

> "[T]he aggrieved employee must present evidence that the respondent engaged in behavior (1) that was severe or pervasive enough to create a work environment that a reasonable person would find to be 'hostile or abusive'; and (2) that the employee herself subjectively perceived to be hostile or abusive. [Citation.] In determining whether both of these elements have been met, the court considers 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' [Citations.] Although the employee need not prove that she suffered tangible psychological injury or a 'nervous breakdown,' the 'mere utterance of an *** epithet which engenders offensive feelings' is insufficient to constitute harassment. [Citation.]" *Cook County Sheriff's Office v. Cook County Comm'n on Human Rights*, 2016 IL App (1st) 150718, ¶ 32.

¶ 45    Plaintiff initially argues the trial court failed to apply the continuing violation theory to consider alleged acts of harassment that occurred outside the limitations period of the Act (see 775 ILCS 5/7A-102(A)(1) (West 2016)) resulting in an erroneous determination of the severity and pervasiveness of the harassment plaintiff allegedly suffered. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the

limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). Defendant calls plaintiff's continuing violation argument a "red herring" because "there is no evidence the Circuit Court discounted any harassment allegations outside the limitations period. Instead, the Circuit Court considered both the untimely August 2014 allegations together with the timely July 2015 allegations and still found they did not meet the 'severe or pervasive' standard."

> "[T]he party alleging the discrimination has the burden of showing that the harassing actions outside the statutorily prescribed period were sufficiently closely related to the harassing actions occurring within the statutory time frame to be considered an ongoing violation.
>
> > 'Courts will consider three factors in making this determination: (1) whether the acts involve the same subject matter; (2) the frequency at which they occur; and (3) the degree of permanence of the alleged acts of discrimination, "which should trigger an employee's awareness of and duty to assert his or her rights." [Citations.] The continuing violation doctrine is applicable only if "it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct, as in a case in which the conduct could constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." [Citations.]' [Citation.]" *Graves v. Chief Legal Counsel of Illinois Department of Human Rights*, 327 Ill. App. 3d 293, 298 (2002), quoting *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996).

¶ 46    In this appeal plaintiff concedes "no single comment rose to the level of 'sufficiently severe or pervasive to alter the conditions of employment.' " Plaintiff argues that in his case "[i]t was not until looking at the combination of all harassing comments that Plaintiff endured that he realized that he had a duty to assert his rights against actionable harassment. Whether the trial court applied the continuing violation doctrine notwithstanding (see *supra*, ¶ 32 n3), this court will consider all of plaintiff's alleged acts of harassment to determine whether it was "so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment" and, if necessary, apply the factors stated in *Galloway* to determine if all of the acts "were sufficiently closely related to the harassing actions occurring within the statutory time frame to be considered an ongoing violation."

¶ 47    Plaintiff argues that when viewed in totality it is clear "the severe, pervasive, and incessant, harassment" plaintiff suffered rose to the "level of a hostile work environment." Plaintiff argues he received harassing comments based on his national origin and perceived sexual orientation from four different supervisors both individually and in front of fellow employees, and he was subjected to epithets by Houston, Duggan, and Studer consistently from August 2014 until his termination. Defendant responds plaintiff cited no evidence for his claim he was consistently subjected to sexual-orientation epithets and, stripped of that allegation, plaintiff's "hostile work environment claim is based on a handful of comments over a 16-month period of time, mainly stemming from two separate interactions 11 months apart (August 2014 and July 2015)."

¶ 48    "To be severe or pervasive enough to create a hostile work environment, conduct must be 'extreme.' [Citation.] Determining whether behavior crosses that threshold is not subject to 'a mathematically precise test.' [Citation.] Rather, it depends on 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

- 24 -

performance.' [Citation.]" *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018). "A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir. 1995). Further, "relatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment." (Internal quotation marks omitted.) *Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 398 (7th Cir. 1999). In this case, examining the evidence in a light most favorable to plaintiff, we hold plaintiff has not raised a genuine issue of material fact that the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment. *Smith*, 936 F.3d at 560.[6]

¶ 49    Plaintiff alleges two comments by Moore, one based on sexual orientation and one based on nationality, almost a year-and-a-half apart (August 2014 and January 2016). Although plaintiff listed two comments by Moore (in August 2014 Moore referred to plaintiff as gay and asked plaintiff if he was "going to the gay bars in the city tonight") plaintiff testified in his deposition that those comments were made at the same time. In his deposition plaintiff admitted that all three of Houston's comments in August 2014 (in August 2014 Houston stated to plaintiff "what is it with you Russians trying to take

---

[6]    We make this finding considering all of plaintiff's allegations, but we note that the Act "does not provide a cause of action for a hostile work environment based on sexual orientation harassment. Section 2-102(D) of the [Act] prohibits sexual harassment, which is defined as 'any unwelcomed sexual advances or requests for sexual favors or any conduct of a sexual nature when *** such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.' 775 ILCS 5/2–101(E) (West 2016). The conduct and actions plaintiff points to *** do not qualify as, nor does plaintiff argue that they are, 'sexual advances,' 'requests for sexual favors,' or 'conduct of a sexual nature.' Because the plain language of the [Act] requires a hostile work environment claim to be based on sexual harassment, and plaintiff has not identified (or even pled) any evidence of sexual harassment, defendant's motion for summary judgment with respect to [plaintiff's claim of perceived sexual orientation harassment was proper.'" *Martinez v. Nw. University*, 173 F. Supp. 3d 777, 784–85 (N.D. Ill. 2016).

over the railroad," "all Russians have a drinking problem," and "Russians drink all the time.") were in one conversation. (C 862) Almost a year later in July 2015 (on or about July 24, 2015) Houston made comments referencing plaintiff's nationality ( "You fucking Russian, you don't know how to do your job;" "are you USSR;" and "are you KGB?") and Duggan made comments referencing plaintiff's perceived sexual orientation (stating "hey guys, don't drop the soap, Lyubo is here;" asking plaintiff "are you hitting up Boystown tonight?" and asking plaintiff "are you too scared to mess up your looks;" then, on July 24, 2015, after plaintiff complained about Houston to Duggan, responding "quit being a little bitch;" and on July 27, 2015, stating "you look like a gay Russian;" and "is that what Russian f**s wear in Russia?"). In August 2015 Houston allegedly referred to plaintiff and his brother as "USSRs;" then, four months later on December 14, 2015, after plaintiff returned to work Studer stated to plaintiff "I don't give a flying f*** if you tell Rick Galvin this or not, I'm not here to play games, I have r******* Carmen missing seal steps and broken handholds, I'm not f****** playing games, I will fire your foreign ass if you get in my way." Thus there were two incidents in August 2014, almost one year later in July 2015 there were arguably four incidents, one incident one month later in August 2015, and five months later there was another incident in December 2015 followed less than a month later with an incident in January 2016. With regard to the alleged persistent use of a sexual orientation epithet, in reply, plaintiff cited to his deposition testimony where he recounts (at most) two instances in which Duggan directed a sexual-orientation epithet at plaintiff and another where Duggan teased plaintiff about his choice of clothing apparently during the same incident in which Duggan allegedly asked plaintiff "where you going out to, Boystown?"

¶ 50    The record evidence is that the alleged harassment plaintiff allegedly suffered was infrequent. Nor do we find the comments allegedly directed toward plaintiff were severe. "[T]he 'mere utterance of an *** epithet which engenders offensive feelings' is insufficient to constitute harassment. [Citation.]"

*Cook County Sheriff's Office*, 2016 IL App (1st) 150718, ¶ 32. The comments were not physically threatening, objectively not humiliating but a "mere offensive utterance," and there are no facts from which to reasonably infer that the comments interfered with plaintiff's work performance. See *id.*

¶ 51    This court must "look to the totality of the circumstance and ask whether everything together constitutes a hostile or abusive environment." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018). "We also assume employees are generally mature individuals with the thick skin that comes from living in the modern world." *Id.* "As a result, employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Id.* To survive summary judgment plaintiff had to produce sufficient evidence demonstrating, *inter alia*, the work environment was *both* objectively *and* subjectively offensive and the conduct was severe *or* pervasive. *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 667 (N.D. Ill. 2016). In this case, looking to the totality of the circumstances and viewing the allegations in a light most favorable to the non-moving party, plaintiff has failed to produce sufficient evidence that the work environment was objectively offensive or that the conduct was severe or pervasive. Plaintiff has pointed to neither "one extremely serious act of harassment" nor "a series of less sever acts." See *Id.* Rather, plaintiff has provided evidence of only a few isolated and diffuse incidents. Accordingly, we hold that summary judgment in favor of defendant was proper. In light of this holding we have no need to reach defendant's remaining arguments.

¶ 52                                    CONCLUSION

¶ 53    For the foregoing reasons, the circuit court of Cook County is affirmed.

¶ 54    Affirmed.